406 F.2d 886
 DECATURVILLE SPORTSWEAR CO., Inc., et al., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and
International Ladies' Garment Workers' Union, AFL-CIO, Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner, and
International Ladies' Garment Workers' Union, AFL-CIO, Intervenor.
v.
MARLENE INDUSTRIES CORPORATION, et al., Respondents.
 No. 18064.
 No. 18249.
 No. 18250.
 No. 18256.
 No. 18154.
 United States Court of Appeals Sixth Circuit.
 January 29, 1969.
 Rehearing Denied March 5, 1969.
 
 Charles Hampton White, Nashville, Tenn., for petitioners; Gullett, Steele, Sanford & White, Nashville, Tenn., on brief.
 Charles N. Steele, Atty., N.L.R.B., Washington, D. C., for N.L.R.B.; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Lawrence M. Joseph, Atty., N.L.R.B., Washington, D. C., on brief.
 Morris P. Glushien, New York City, for intervenor.
 Before O'SULLIVAN, CELEBREZZE, and COMBS, Circuit Judges.
 COMBS, Circuit Judge.
 
 
 1
 These cases are before us on petition to review an order of the National Labor Relations Board, 166 N.L.R.B. No. 58. The Board cross-petitions for enforcement. The Board found that Marlene Industries Corporation and its manufacturing subsidiaries had conducted a centrally directed and violent campaign of massive and deliberate unfair labor practices at all seven of its manufacturing plants; that it had restrained and coerced employees in violation of Section 8(a) (1) of the Act, and discriminatorily discharged or refused to rehire seventeen named employees in violation of Section 8(a) (3) of the Act.
 
 
 2
 The Board's order includes the usual provisions requiring that the company cease and desist from its unfair labor practices, post notices and reinstate employees wrongfully discharged. The order contains additional provisions which, to borrow a phrase from N.L.R.B. v. H. W. Elson Bottling Company, 379 F.2d 223 (6th Cir. 1967), are stronger medicine. Those provisions require that the company
 
 
 3
 1) mail the required notice to all employees and grant the union, upon request, reasonable access for one year to plant bulletin boards and places where employee notices are customarily posted;
 
 
 4
 2) permit union organizers for a period of six months to have access during non-working time to plant approaches and parking lots, subject to reasonable and non-discriminatory regulations in the interest of plant efficiency and discipline; and
 
 
 5
 3) provide the union, upon request made within one year, with a list of the names and addresses of all employees.
 
 
 6
 It is conceded by the Board that the above enumerated provisions of the order are unusual, but it is said that this is an unusual case.
 
 
 7
 Marlene Industries and its seven wholly owned subsidiary manufacturing plants employ approximately 3,000 workers in Tennessee, Alabama, and South Carolina. In May, 1965, the International Ladies' Garment Workers' Union commenced an organizational campaign among employees of the subsidiary plants. The company countered with a concerted and well-directed campaign of anti-union activities which led to these proceedings. The activities included, inter alia, coercive speeches by Marlene executives, and promises that if the union was rejected benefits such as Christmas bonuses, fully paid life insurance policies, and additional paid holidays would be forthcoming. Speeches were also made by company officials and by prominent local citizens warning that particular plants would be closed if organized.
 
 
 8
 Union organizers were prohibited from distributing literature on company property. Union attempts to distribute literature on public property adjacent to company grounds were frustrated when management oriented employees utilized such tactics as spraying ink on organizers, throwing tomatoes at them, knocking leaflets from their hands, removing leaflets from car windshields and damaging the organizers' cars. The organizers' task of distributing union literature was also hampered when the flow of traffic from company parking lots was expedited by halting cars on adjacent public roads, thus speeding the employees' exit from the plants. Employees were questioned about union activities and urged not to accept union literature. Organizers were kept under surveillance by the company and employees who accepted leaflets were photographed and a record made of their names. Organizers' cars were forced off the highway, and the organizers were threatened with physical injury.
 
 
 9
 The foregoing are typical, but not exclusive, of the massive anti-union activities carried on by the company. Although each specific act listed did not occur at every plant, some of them did occur at each of the plants and many of them occurred at all plants.
 
 
 10
 The company contends that the Board's findings are not supported by substantial evidence, and argues that the Board systematically discredited all evidence offered by the company, drew adverse inferences from the failure of some company officials to testify, and placed the company under an erroneous burden of proof. We disagree. The evidence is overwhelming that the company was guilty of deliberate and flagrant violations of the Act.
 
 
 11
 In view of the Board findings, and ours, that this is an aggravated case of deliberate and flagrant violation of the Act by the company, we concern ourselves only with the appropriateness of the Board's order. Although the company attacks the Board's order in its entirety, it directs its heaviest fire toward those provisions which allow union organizers to have access for six months to company parking lots; requires the company, upon request, to furnish the union with a list of the names and addresses of all company employees; and makes the order applicable to all plants without regard to specific violations found to have occurred at the respective plants.
 
 
 12
 In the review of an administrative order, the courts will ordinarily consider the relation of remedy to policy as peculiarly within the field of administrative competence. The remedy provided in an order will not be disapproved unless its apparent purpose is to achieve ends other than those which fairly effectuate the policies of the Act. Fibreboard Paper Products Corp. v. National Labor Relations Board, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). The Board's order may not go beyond that which is necessary to redress the injury done to the company's employees. It may not be used as an instrument of punishment for the employer. Local 57, International Ladies' Garment Workers' Union v. N. L.R.B., 126 U.S.App.D.C. 81, 374 F.2d 295 (1967), cert. denied, 387 U.S. 942, 87 S.Ct. 2078, 18 L.Ed.2d 1328 (1967). The order should as nearly as possible restore the parties to the status quo which existed before the unfair practices occurred. It should eliminate the imbalance created by the violations of the Act. See Local 60, United Brotherhood of Carpenters and Joiners of America v. National Labor Relations Board, 365 U.S. 651, 81 S.Ct. 875, 6 L. Ed.2d 1 (1961).
 
 
 13
 The company's argument that the order should be tailored to fit separately each of the seven plants cannot be sustained. The rule is that an order need not be so limited where, as here, the company has directed a system-wide and centrally coordinated movement to commit unfair labor practices. National Labor Relations Board v. Salant & Salant, Inc., 183 F.2d 462 (6th Cir. 1950); also see Montgomery Ward & Co. v. N. L.R.B., 339 F.2d 889 (6th Cir. 1965).
 
 
 14
 It is clear, too, that under the circumstances here shown the Board did not abuse its discretion in ordering the company to mail a copy of the notice to all employees and to grant the union access for a period of one year to company bulletin boards and other places where notices to employees are usually posted. N.L.R.B. v. H. W. Elson Bottling Company, 379 F.2d 223 (6th Cir. 1967); Textile Workers Union of America v. N.L.R.B., 388 F.2d 896 (2nd Cir. 1967), cert. denied, J. P. Stevens & Co., Inc. v. N.L.R.B., 393 U.S. 836, 89 S.Ct. 112, 21 L.Ed.2d 107 (1968).
 
 
 15
 Since many of the company's unfair practices were directed toward thwarting the union's efforts to distribute literature to employees as they left work, granting access to parking lots under reasonable restrictions is directly related to the company's unlawful activity. This provision merely removes the disadvantages caused to the union by reason of the company's violations. Cf. Consolidated Edison Company v. National Labor Relations Board, 305 U.S. 197, 236, 59 S.Ct. 206, 83 L.Ed. 126 (1938). Thus is restored the status quo which existed at the outset of the organizing campaign. National Labor Relations Board v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), on which the company relies, is not inconsistent with our decision on this point. There, the question was whether denial of access to company property in order to distribute union literature constituted an unfair labor practice and the Supreme Court held it did not. Here, the question is whether reasonable access to company property for a limited time is an appropriate remedial measure after a finding of unfair labor practices. The two questions involve different considerations. We conclude therefore that this is a valid exercise of the Board's authority. We note that this provision is limited to a six months' period and is subject to reasonable regulations in the interest of plant efficiency and discipline. Should the union abuse the privilege and interfere with plant discipline or efficiency, the company has recourse to the Board and ultimately to the courts.
 
 
 16
 We look now to that part of the order which requires the company to furnish to the union a list of the names and addresses of all company employees. We think this provision goes too far. Other provisions of the order which we are now approving will provide opportunity for reasonable access to employees and should eliminate from their minds any fear of reprisal for engaging in lawful union activity. This information would normally have been unavailable at the outset of the organizing campaign. Thus, this provision grants to the union a substantially greater right than it would have had originally. This strikes us as doing more than redressing an imbalance. The employer's obligation to allow his employees to discuss self-organization among themselves is greater than his obligation to furnish information to non-employee organizers. Textile Workers Union of America v. N.L. R.B., 388 F.2d 896 (2nd Cir. 1967), cert. denied, J. P. Stevens & Co., Inc. v. N.L. R.B., 393 U.S. 836, 89 S.Ct. 112, 21 L.Ed. 2d 107 (1968); N.L.R.B. v. Challenge-Cook Brothers of Ohio, Inc., 374 F.2d 147 (6th Cir. 1967); see National Labor Relations Board v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956). In the latter instance consideration must be given not only to the question of the employer's property rights and right to privacy but also to the employees' right to privacy and freedom from harrassment at home. In the Textile Workers case, supra, the Second Circuit denied enforcement of a similar provision under somewhat similar circumstances. We therefore deny enforcement of that part of the Board's order in the instant case.
 
 
 17
 The Board's petition for enforcement is granted except for the provision which directs the company to furnish to the union a list of the names and addresses of its employees.